**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

WILDEARTH GUARDIANS
312 Montezuma Ave.
Santa Fe, NM 87501

       Plaintiff,

v.

DIRK KEMPTHORNE, Secretary of the Interior
1849 C Street, NW
Washington, DC 20240

       Defendant.

---

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

---

## INTRODUCTION

1.     Plaintiff, WildEarth Guardians ("Guardians") brings this action against

Defendant, Dirk Kempthorne, U.S. Secretary of the Interior, in his official capacity, to force him

to carry out his duties under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq.

Secretary Kempthorne (the "Secretary," or alternatively the "U.S. Fish and Wildlife Service" or

"FWS") has failed to comply with his mandatory duty to make a preliminary 90-day finding on

Guardians' Petition to list the Black-tailed Prairie Dog, *Cynomys ludovicianus*, (the "Prairie

Dog") as an Endangered or Threatened species under the ESA and to designate its critical

habitat.  This lawsuit seeks to force the Secretary to make the overdue finding on Guardians'

Petition.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 16 U.S.C. §§ 1540(c) and (g) (action arising under the ESA and citizen suit provision), and the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA").

3.      This Court has authority to grant Guardians' requested relief pursuant to 28 U.S.C. §§ 2201-02 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706 (APA).

4.      More than 60 days ago, Guardians furnished FWS with written notice of its violations of the ESA and of Guardians' intent to sue. See 16 U.S.C. § 1540(g)(2).

5.      FWS has not remedied its violation of the ESA by making the overdue finding on Guardians' Petition therefore an actual controversy exists between the parties within the meaning of the Declaratory Judgment Act.  28 U.S.C. § 2001.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A).  Secretary Kempthorne officially resides in this judicial district and the acts and omissions complained of occurred in this judicial district.

## PARTIES

7.      Plaintiff WILDEARTH GUARDIANS ("Guardians") sues on behalf of itself and its adversely affected members.  WildEarth Guardians is a new non-profit environmental organization created on January 28, 2008, by the merger of three organizations: Forest Guardians; Sinapu; and Sagebrush Sea Campaign.  Forest Guardians, a predecessor in interest of WildEarth Guardians, was the lead petitioner and primary drafter of the Prairie Dog Petition at issue in this case.  WildEarth Guardians continues Forest Guardians' efforts to protect the Prairie Dog and its broader mission to protect and restore wildlife and wildlands in the American Southwest.  WildEarth Guardians has over 4,500 members, some of whom reside in the District

of Columbia.  Guardians has an active endangered species protection campaign, geographically

focused on the southern Great Plains and the Southwest.  As part of this campaign, Guardians

urges FWS to list imperiled species, such as the Prairie Dog, as threatened or endangered species

under the ESA.  In early August 2007, Guardians petitioned FWS to protect the Prairie Dog

under the ESA.  Guardians spent several months and devoted significant organizational resources

to preparing the Prairie Dog Petition and is injured by FWS's failure to respond to it.  Guardians'

members frequently use and enjoy the Prairie Dog and its habitat for wildlife viewing,

recreational, aesthetic, and scientific activities and will continue to do so.  WildEarth Guardians

and its members are particularly concerned with the conservation of the Prairie Dog and the

ecosystem which the Prairie Dog supports and upon which it depends.  WildEarth Guardians and

its members have a substantial interest in this matter and are adversely affected by the

Secretary's failure to comply with the ESA.  The requested relief will redress Guardians' and its

members' injuries.

8.      Defendant, DIRK KEMPTHORNE, is the Secretary of the United States

Department of the Interior.  As such he has ultimate responsibility for implementation of the

ESA.  He is sued in his official capacity.  In this case, the Secretary has delegated his

responsibilities under the ESA to the U.S. Fish and Wildlife Service ("FWS"), an agency within

the U.S. Department of the Interior.

## LEGAL BACKGROUND

9.      Congress passed the ESA to "provide a means whereby the ecosystems upon

which endangered species and threatened species depend may be conserved, [and] to provide a

program for the conservation of such endangered species and threatened species…." 16 U.S.C.

1531(b).

10.     To this end, the ESA requires FWS to list species of plants and animals that are facing extinction as "threatened" or "endangered" and to designate protected "critical habitat" for each listed threatened or endangered species.  16 U.S.C. § 1533(a).  An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range…." 16 U.S.C. § 1532(6).  A "threatened species" is a species "which is likely to become an endangered species within the foreseeable future…." 16 U.S.C. § 1532(20).

11.     In order for the ESA to protect a species, FWS must first officially list the species as either threatened or endangered.  16 U.S.C. § 1533(d).  The listing process is the critical first step in the ESA's system of species protection and recovery.  FWS must also list the species' habitat as "critical habitat" to receive several important substantive and procedural ESA protections.

12.     Any interested person can initiate the listing process by filing a petition to list a species with FWS.  16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).

13.     Upon receipt of a petition to list a species, FWS is required to make an initial finding known as a "90-day finding."  Specifically, within 90 days, FWS must determine, "to the maximum extent possible," whether the petition presents "substantial scientific or commercial information indicating that the petitioned action may be warranted."  16 U.S.C. § 1553(b)(3)(A). The ESA's implementing regulations define "substantial information" as "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted."  50 C.F.R. § 424.14(b).

14.     If FWS finds that the petition presents substantial information, FWS "shall promptly commence a review of the status of the species concerned," and must publish the finding in the Federal Register.  16 U.S.C. § 1533(b)(3)(A).

15.     If FWS makes a positive 90-day finding, it has 12 months from the date that the

petition was received to make one of three findings: (1) the petitioned action is not warranted; (2)

the petitioned action is warranted; or (3) the petitioned action is warranted but presently

precluded by other pending proposals to list species of higher priority, provided that FWS is

making expeditious progress on listing items.  16 U.S.C. § 1533(b)(3)(B); 50 C.F.R. §

424.14(b)(3).  This is known as the 12-month finding.

16.     If FWS makes a 12-month finding that the petitioned action is warranted, then it

must publish a proposed rule to list the species as endangered or threatened in the Federal

Register.  16 U.S.C. § 1533(b)(5).

17.     Within one year of the publication of a proposed rule to list a species, FWS must

make a final decision on the proposal.  16 U.S.C. § 1533(b)(6)(A).

18.     "Concurrently" with listing a species as threatened or endangered, FWS must

designate critical habitat for the species to the maximum extent prudent and determinable.  16

U.S.C. §1533(a)(3)(A)(i), see also § 1533(b)(6)(C).

19.     Designation of critical habitat for listed species provides additional necessary

protection and aids in the conservation of the species because all federal agencies must consult

with FWS to "insure that an action authorized, funded, or carried out by [federal agencies] is not

likely to jeopardize the continued existence of any endangered species or threatened species *or*

*result in the destruction or adverse modification of [its critical habitat]*."  16 U.S.C. § 1536(a)(2)

(emphasis added).

## FACTS

20.     The largely misunderstood Black-tailed Prairie Dog, *Cynomys ludovicianus*, is

actually a ground squirrel.  It is a gregarious creature and lives in a complex social community

called a prairie dog town or colony. The Black-tailed Prairie Dog is one of five species of prairie

dog found in North America. The others are the Utah Prairie Dog (listed as threatened under the

ESA), the Gunnison's Prairie Dog (whose ESA status is subject to a separate lawsuit), the White-

tailed Prairie Dog (whose ESA status is subject to a separate lawsuit), and the Mexican Prairie

Dog (listed as endangered under the ESA).

21.     Contrary to the prevailing view of the livestock industry and many governmental

agencies, the Black-tailed Prairie Dog is not a destructive pest. Indeed, many scientists have

concluded that Black-tailed Prairie Dogs have little, if any, detrimental effect on rangelands.

The emerging scientific consensus is that prairie dogs help to maintain the maximum

productivity of prairie grasslands and do not present a significant economic threat to livestock

interests.

22.     The Black-tailed Prairie Dog also supports an incredible diversity of other

wildlife species. Recent studies have documented over one hundred species that are associated

with the Black-tailed Prairie Dog. Some, like the endangered black-footed ferret, are almost

exclusively dependent upon prairie dogs for food and on prairie dog burrows for shelter. The

swift fox, mountain plover, and ferruginous hawk, all declining species associated with prairie

dog colonies, are closely tied to the survival of the Black-tailed Prairie Dog. The burrowing owl,

dependent on prairie dog towns for nesting habitat and feeding grounds, is also in decline

throughout its range.

23.     Scientifically, the Black-tailed Prairie Dog is described as a "keystone species,"

meaning that if Black-tailed Prairie Dog populations decline, other dependent species'

populations will also decline.

24.     Historically, the Black-tailed Prairie Dog thrived across the desert, short-grass and mixed-grass grasslands, of Arizona, Colorado, Kansas, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas, and Wyoming.  The first official U.S. government explorers of this territory, Lewis and Clark, reported "infinite numbers" of prairie dogs in the early 1800s.  Other 19th century naturalists supported this observation.  One historic Black-tailed Prairie Dog town in the Texas Panhandle was reported to be 250 miles long and 100 miles wide.  Another colony in Montana was estimated, in 1872, to be 30 or 40 miles long.

25.     Modern researchers estimate that the total extent of the land area once covered with Black-tailed Prairie Dogs was approximately 100 million acres.  Multiple sources place the historic Black-tailed Prairie Dog population in the hundreds of millions to billions.

26.     Today things are much different.  Government sponsored poisoning programs began around 1915 and continue to the present.  In some years, as many as 125,000 men worked to poison prairie dogs and the poisoning covered as many as 20 million acres.  Strychnine and Compound 1080 were used in prairie dog eradication programs across the Great Plains and American Southwest.  When these poisons were banned for killing prairie dogs because of their secondary poisoning effects, the government approved zinc phosphide and aluminum phosphide to poison prairie dogs on both public and private land.

27.     These eradication efforts, combined with the onset of sylvatic plague, a disease introduced to North American by humans around 1899 and to which prairie dogs are extremely susceptible, have drastically reduced Black-tailed Prairie Dog populations.  Indeed, many scientists believe that sylvatic plague alone might have caused the immediate extinction of the species, but for the prairie dog's originally large and dispersed population.  Prairie dogs have no

known immunity to this disease. Sylvatic plague is now present in every state within the Black-tailed Prairie Dog's range.

28.    Currently, Black-tailed Prairie Dogs occupy about 1% to 2% of their historically occupied acreage. Black-tailed Prairie Dogs have been extirpated from Arizona. In many local areas of Kansas, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, and Texas, Black-tailed Prairie Dogs have similarly vanished.

29.    Despite the relatively large numbers of individual Black-tailed Prairie Dogs remaining, the species' long-term survival is direly threatened. Few, if any species, have suffered such catastrophic declines from historic levels and not been afforded the protections of the ESA.

30.    In 1998, conservation organizations, which included members of WildEarth Guardians, petitioned the Secretary of Interior to list the Black-tailed Prairie Dog as a threatened species under the ESA. In 2000, after a lawsuit to force a ruling on the petition, the Secretary determined that the Black-tailed Prairie Dog warranted the protection of the ESA, but that immediate action was precluded by the need to list other, highly imperiled species. 65 Fed. Reg. 5476, 5487-88 (February 4, 2000).

31.    On October 30, 2001 and on June 13, 2002, the Secretary issued renewed petition findings concluding that the Black-tailed Prairie Dog continued to warrant listing under the ESA, but that the Secretary was precluded from immediately doing so by other priority listing actions. See 66 Fed. Reg. 54808, 54816 (Oct. 30, 2001); 67 Fed. Reg. 40657, 40665 (June 13, 2002). In both instances, the Secretary concluded the overall magnitude and immediacy of threats to the species remained unchanged. Id.

32.     However, on August 18, 2004, the Secretary issued a new decision, dramatically

reversing her prior conclusions, and determined that the listing of the Black-tailed Prairie Dog

under the ESA was "not-warranted."  69 Fed. Reg. 51217, 51226 (August 18, 2004).   No

significant changes in the underlying threats to the Black-tailed Prairie Dog took place between

June 2002 and August 2004, rather, the Secretary arbitrarily changed her opinion of what the

scientific facts indicated.

33.     The Secretary's August 18, 2004 "not warranted" finding was not based solely on

the best available science, as required by the ESA; rather, it was a result of political pressure.

Economic, political, or any other non-biological issues may not properly be considered in an

ESA listing decision.  See e.g. Northern Spotted Owl v. Hodel, 716 F.Supp. 479, 480

(W.D.Wash. 1988).  The Secretary's not warranted finding came during the heat of the 2004

election cycle and was the result of political pressure from livestock interests, particularly in

South Dakota.  Indeed, nearly every major politician running for office in South Dakota in 2004

took credit for pressing the Secretary to issue the not-warranted finding.  A spokeswoman for

Sen. Tim Johnson, (D.S.D.) specifically stated:  "The members of this delegation have had

countless meetings on this issue, written letters, made phone calls, put pressure on the [Bush]

administration officials at hearings and, in the end, got results."  Both the Republican and

Democratic candidates in South Dakota's 2004 senate race, John Thune and Tom Daschle, took

credit for pressuring the Secretary to reverse course.  South Dakota's governor, Mike Rounds,

and other politicians also claimed credit for applying political pressure on the Secretary to force

the not-warranted finding.  Governor Rounds summed up the political pressure his

administration put on the Secretary by saying, "[r]esults are what we're looking for, and results

are what we have here today."  However, in forcing the Secretary's to acquiesce to their political

demands, these politicians also forced the Secretary to violate the ESA by issued a decision

based on political calculations rather than solely upon scientific grounds.

34.     Further evidence of this political interference comes from an unlikely

coincidence.  Simultaneously with the release of the Secretary's not warranted finding, three

federal agencies, the United States Forest Service, the Animal Plant Health Inspection Service,

and the Fish and Wildlife Service (the later acting on behalf of the Secretary), forwarded a

document called the South Dakota Prairie Dog Management 2004-05 Inter-Agency Action-Plan

to Governor Rounds of South Dakota.  This plan called for "trapping, shooting, and chemical

control" of Black-tailed Prairie Dogs on both public and private land in South Dakota.  The Plan

further called for the Forest Service to pay for poisoning efforts and to remove restrictions on

Prairie Dog poisoning and shooting on Forest Service land.  The Plan resulted in thousands of

acres of Black-tailed Prairie Dogs being poisoned shortly after the Secretary's not warranted

finding.  More importantly, this simultaneous action, completely undercut the Secretary's

conclusions in his 2004 not-warranted finding that the threats to Black-tailed Prairie Dogs from

poisoning and shooting were reduced – they actually increased, and the Secretary knew they

were about to increase when she rendered the challenged decision.

35.     Since 2004, the United States Forest Service has continued to reverse policies to

protect Black-tailed Prairie Dogs, specifically bans on poisoning and shooting of Prairie Dogs on

Forest Service land, and undertaken further actions to increase poisoning and shooting of Black-

tailed Prairie Dogs on Forest Service land.  For example, in 2005 and 2006, the Forest Service

amended the Nebraska National Forest Land and Resource Management Plan in South Dakota

and Nebraska to allow more poisoning of Black-tailed Prairie Dogs.  In 2006, the Forest Service

amended the Pawnee National Grassland Land and Resource Management Plan in Colorado to

allow poisoning and in Wyoming the Forest Service is proceeding to amend the Thunder Basin

National Grassland Plan to allow poisoning.  Similarly, the U.S. Bureau of Land Management,

an agency in the Department of Interior under the Secretary's control, is moving to amend the

Casper Resource Area Management Plan in Wyoming to allow poisoning on public land.

36.    The Secretary's August 2004 not warranted finding acknowledged, as had

previous Federal Register notices, that Black-tailed Prairie Dogs were absent from approximately

98% of their historic range.  Specifically, the Secretary stated that the original Black-tailed

Prairie Dog range was approximately 100,000,000 acres and that the present range was

approximately 1,842,000 acres (approximately a 98% reduction).  However, in violation of the

ESA, the Secretary never considered whether this 98% reduction in range meant the Black-tailed

Prairie Dog was "likely to become an endangered species within the foreseeable future

throughout all or a significant portion of its range."  16 U.S.C. § 1532(20) (emphasis added).  If

98% is not a "significant portion" of a species' range the phrase holds little meaning.  Though

the remaining 2% of Black-tailed Prairie Dog populations exist as scattered islands in many parts

of the species historic range, the Secretary further failed to analyze whether the species was

completely eliminated from a significant part of its historic range, including Arizona, western

New Mexico, eastern Kansas, eastern Nebraska, eastern North and South Dakota, eastern

Oklahoma, and eastern Texas.

37.    Rather, than consider the 98% reduction, the Secretary emphasized that the

1,842,000 acre figure was an increase over previous estimates of remaining Prairie Dog

populations.  However, this figure was inflated and did not rely on the best available science.  In

reaching her conclusion the Secretary relied on aerial surveys of Prairie Dog colonies, largely

performed by State wildlife agencies who were adamantly opposed to Prairie Dog protection.

These surveys do not represent the best available science, and in many instances were proven

incorrect by follow-up ground surveys.  This is because a Prairie Dog colony's burrows remain

visible from the air even if the Prairie Dogs formerly occupying them have been poisoned, shot,

or died of plague.   The Secretary essentially manufactured increased Black-tailed Prairie Dog

range on paper, with data provided from biased sources, and never bothered to ground-truth the

aerial surveys, ignoring evidence they were inflated.

38.    Additionally, in the 2004 not warranted finding the Secretary inexplicably

discounted the effects of sylvatic plague on Black-tailed Prairie Dogs in a direct contradiction of

her prior findings in 2000, 2001, and 2002.  The Secretary acknowledged that plague was present

in all of Black-tailed Prairie Dog habitat in Montana, Wyoming, Colorado, New Mexico, and

Arizona and in portions of western North Dakota, Nebraska, Kansas, Oklahoma, and Texas.  The

Secretary then relied on the absence of plague in the eastern portions of North Dakota, Nebraska,

Kansas, Oklahoma and Texas to conclude plague was not as large a threat as previously thought.

However, the Secretary completely failed to acknowledge that Prairie Dogs were already absent

from the eastern portions of these same states due to other factors, such as the conversion of

prairie to cropland.  The Secretary's reliance on the absence of plague in these eastern areas as

somehow ameliorating the threat to Prairie Dog populations is completely disingenuous as

Prairie Dogs are already absent from these areas.  The Secretary did indicate that all of South

Dakota was plague free, but this assertion was quickly proven incorrect by the appearance of

plague in at least parts of western South Dakota shortly after the Secretary's finding.

Accordingly, the Secretary's statements about plague in the 2004 decision are entirely

misleading or false.  Plague does not exist in the eastern portion of the Black-tailed Prairie Dog's

historic range, but neither do Prairie Dogs.  The one significant area of the Black-tailed Prairie

12

Dog's current range where plague did not exist, South Dakota, now has plague. Plague is currently present everywhere that Black-tailed Prairie Dog populations remain. Scientists believe this alone may lead to the extinction of the Prairie Dog. In any event, it is clear nothing improved regarding the impact of plague on Black-tailed Prairie Dogs between June 2002 and August 2004. The Secretary simply arbitrarily re-interpreted the same data to reach a different conclusion.

39.    Finally, in the 2004 not warranted finding the Secretary relied upon management efforts undertaken by various states and tribes throughout the Black-tailed Prairie Dog's range, presumably between June 2002 and August 2004, as a justification for concluding that other regulatory measures to protect the species were no longer inadequate. At that time, this conclusion was speculative because it relied on future promised conservation measures with no proven track record of success. Future conservation mechanisms can not have a "proven track record for effectiveness in protecting species." See e.g. Save Our Springs v. Babbitt, 27 F.Supp.2d 739, 748 (W.D.Texas 1997). Additionally, many of these conservation measures were not regulatory, further violating the ESA. See e.g. Southwest Ctr. For Biological Diversity v. Babbitt, 939 F.Supp. 49, 52 (D.D.C. 1996) (requiring decisions to be made based on existing regulatory mechanisms). Moreover, as discussed above, many of these promised conservation measures were immediately removed, like the U.S. Forest Service's ban on poisoning and recreational shooting on public land, once the not warranted finding was issued, dramatically illustrating the Secretary's misplaced reliance on these measures. Similarly, state and local governments have also removed Prairie Dog protections previously relied upon by the Secretary. For example, the Colorado Division of Wildlife removed a ban on shooting Black-tailed Prairie Dogs on public land in 2006. In 2006, the Colorado Division of Wildlife also approved a device

called the Rodenator to kill Prairie Dogs.  The Colorado Agricultural Commission followed suit,

approving the Rodenator to kill prairie dogs in early 2007.  This device uses an explosive gas to

destroy Prairie Dogs in their burrows and poses an additional new threat.  The City of Boulder,

Colorado overturned its moratorium on poisoning Black-tailed Prairie Dogs on its significant

open space preserves and went forward with a plan to allow poisoning in 2006.  Similarly, in

2006, the City of Broomfield, Colorado codified that poisoning is its default option for managing

Prairie Dogs, instead of removal and re-location.  South Dakota re-defined the Prairie Dog as a

pest species in 2006 and Lincoln County, Kansas launched a plan to kill all the Black-tailed

Prairie Dogs in the County.  Several Colorado Counties also recently announced programs to pay

landowners for poison used to kill Prairie Dogs.  In short, the Secretary's reliance on state and

local management efforts was speculative in 2004 and has proven to be completely misplaced.

40.    As discussed above, there are numerous errors and legal violations in the

Secretary's 2004 not-warranted decision.  However, some of these errors and much of the

significant new information came to light only after the Secretary's 2004 decision.  Accordingly,

WildEarth Guardians, decided to present this new information and point out the errors in the

Secretary's 2004 decision by filing a new petition to list the Prairie Dog with the Secretary.  In

its August 2007 Petition, the subject of this lawsuit, WildEarth Guardians argues that based on

the best currently available scientific evidence the Black-tailed Prairie Dog is threatened with

extinction in the foreseeable future throughout all or a significant portion of its range.  The

Black-tailed Prairie Dog population has declined to a dangerously low level and without

immediate intervention the species will suffer functional or ecological extinction in the

foreseeable future throughout a significant portion of its range.

41.    FWS received Guardians' Petition to list the Prairie Dog by fax on August 1, 2007. The Secretary received Guardians' Petition by certified mail on August 8, 2007. When FWS failed to respond to the Petition within 90-days, on November 21, 2007, Guardians sent a formal notice letter providing FWS and the Secretary with notice of Guardians' intent to sue to force a ruling on its Petition. FWS acknowledged its receipt of Guardians' notice letter by return letter dated January 10, 2008. In its January 10, 2008 letter FWS stated that it anticipated making a 90-day finding on Guardians' Petition by September 2008. FWS's promise to make a 90-day finding by September 2008 is neither explicit, it is modified by the word anticipates, nor enforceable. Given Guardians' past experiences with similar promises from FWS, Guardians does not believe FWS will honor its current representation to rule on the Petition by September 2008. Accordingly, Guardians files this lawsuit to force FWS to comply with the law.

42.    Pursuant to the ESA, FWS should have made a 90-day finding on Guardians' Prairie Dog Petition on or about November 8, 2007.

43.    To date FWS has failed to make the 90-day finding on Guardians' Petition.

## CLAIM FOR RELIEF

44.    Each and every allegation set forth in this Complaint is incorporated herein by reference.

45.    FWS has failed to make a 90-day finding on WildEarth Guardians' Petition to list the Black-tailed Prairie Dog, *Cynomys ludovicianus,* and has failed to publish such finding in the Federal Register.

46.    FWS has violated its duty under the ESA by failing to make an initial 90-day finding within 90-days because it is practicable to make such a finding. 16 U.S.C. § 1533(b)(3)(A); 5 U.S.C. §706(1).

47.    By failing to render a 90-day finding on WildEarth Guardians' Petition to list the

Black-tailed Prairie Dog, *Cynomys ludovicianus*, FWS has unreasonably delayed and unlawfully

withheld compliance with section 4(b)(3)(A) of the ESA within the meaning of the APA.  16

U.S.C. § 1533(b)(3)(A); 5 U.S.C. § 706.

## PRAYER FOR RELIEF

WHEREFORE, WildEarth Guardians requests that this Court enter judgment providing

the following relief:

1.    A declaration that FWS has violated the ESA by failing to make a 90-day finding

on WildEarth Guardians' Petition to list the Black-tailed Prairie Dog, *Cynomys ludovicianus*;

2.    A declaration that FWS has unlawfully withheld and unreasonably delayed

agency action in violation of the APA by failing to make a 90-day finding on WildEarth

Guardians' Petition to list the Black-tailed Prairie Dog, *Cynomys ludovicianus*;

3.    An injunction compelling FWS to make a 90-day finding on WildEarth

Guardians' Petition to list the Black-tailed Prairie Dog, *Cynomys ludovicianus*, and to publish

such finding in the Federal Register by a date certain;

4.    An order awarding WildEarth Guardians its costs of litigation, including

reasonable attorney's fees;

5.    Such other and further relief as the Court deems just and proper.


Respectfully submitted this 12th day of March 2008.


s/ Robert Ukeiley
Staff Attorney, WildEarth Guardians
1536 Wynkoop Street, Suite 300


16

Denver, CO 80202
Tel: (720) 563-9306
Fax: (866) 618-1017
E-Mail: rukeiley@wildearthguardians.org

Of Counsel

s/James Jay Tutchton
James Jay Tutchton
Environmental Law Clinic
University of Denver, Sturm College of Law
2255 E. Evans Ave., Suite 365H
Denver, CO 80208
Ph: 303-871-7870
Fax: 303-871-6991
E-Mail: jtutchton@law.du.edu

CIVIL COVER SHEET

Cg—443
AF

JS-44
(Rev.1/05 DC)

| | |
|---|---|
| **I (a) PLAINTIFFS**<br>WildEarth Guardians | **DEFENDANTS**<br>Dirk Kempthorne, Secretary of the Interior |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Robert Ukeiley
WildEarth Guardians
1536 Wynkoop St., Ste. 300, Denver, CO 80202
720-563-9306

Case: 1:08-cv-00443
Assigned To : Friedman, Paul L.
Assign. Date : 3/13/2008
Description: Admn. Agency Review

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- O 1 U.S. Government Plaintiff
- O 3 Federal Question (U.S. Government Not a Party)
- ⊙ 2 U.S. Government Defendant
- O 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | ✗ 6 | O 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

- O **A. Antitrust**
  - ☐ 410 Antitrust

- O **B. Personal Injury/ Malpractice**
  - ☐ 310 Airplane
  - ☐ 315 Airplane Product Liability
  - ☐ 320 Assault, Libel & Slander
  - ☐ 330 Federal Employers Liability
  - ☐ 340 Marine
  - ☐ 345 Marine Product Liability
  - ☐ 350 Motor Vehicle
  - ☐ 355 Motor Vehicle Product Liability
  - ☐ 360 Other Personal Injury
  - ☐ 362 Medical Malpractice
  - ☐ 365 Product Liability
  - ☐ 368 Asbestos Product Liability

- ⊙ **C. Administrative Agency Review**
  - ☐ 151 Medicare Act
  - **Social Security:**
  - ☐ 861 HIA ((1395ff)
  - ☐ 862 Black Lung (923)
  - ☐ 863 DIWC/DIWW (405(g)
  - ☐ 864 SSID Title XVI
  - ☐ 865 RSI (405(g)
  - **Other Statutes**
  - ☐ 891 Agricultural Acts
  - ☐ 892 Economic Stabilization Act
  - ☒ 893 Environmental Matters
  - ☐ 894 Energy Allocation Act
  - ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

- O **D. Temporary Restraining Order/Preliminary Injunction**
  Any nature of suit from any category may be selected for this category of case assignment.
  *(If Antitrust, then A governs)*

- O **E. General Civil (Other)** OR O **F. Pro Se General Civil**

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

(3)

| ○ **G.** *Habeas Corpus/* <br> *2255* <br><br> ☐ 530 Habeas Corpus-General <br> ☐ 510 Motion/Vacate Sentence | ○ **H.** *Employment* <br> *Discrimination* <br><br> ☐ 442 Civil Rights-Employment <br> (criteria: race, gender/sex, <br> national origin, <br> discrimination, disability <br> age, religion, retaliation) <br><br> *(If pro se, select this deck)** | ○ **I.** *FOIA/PRIVACY* <br> *ACT* <br><br> ☐ 895 Freedom of Information Act <br> ☐ 890 Other Statutory Actions <br> (if Privacy Act) <br><br><br> *(If pro se, select this deck)** | ○ **J.** *Student Loan* <br><br> ☐ 152 Recovery of Defaulted <br> Student Loans <br> (excluding veterans) |
| --- | --- | --- | --- |
| ○ **K.** *Labor/ERISA* <br> *(non-employment)* <br><br> ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Mgmt. Relations <br> ☐ 730 Labor/Mgmt. Reporting & <br> Disclosure Act <br> ☐ 740 Labor Railway Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Empl. Ret. Inc. Security Act | ○ **L.** *Other Civil Rights* <br> *(non-employment)* <br><br> ☐ 441 Voting (if not Voting Rights <br> Act) <br> ☐ 443 Housing/Accommodations <br> ☐ 444 Welfare <br> ☐ 440 Other Civil Rights <br> ☐ 445 American w/Disabilities- <br> Employment <br> ☐ 446 Americans w/Disabilities- <br> Other | ○ **M.** *Contract* <br><br> ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & <br> Enforcement of Judgment <br> ☐ 153 Recovery of Overpayment of <br> Veteran's Benefits <br> ☐ 160 Stockholder's Suits <br> ☐ 190 Other Contracts <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | ○ **N.** *Three-Judge Court* <br><br> ☐ 441 Civil Rights-Voting <br> (if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original   ○ 2 Removed   ○ 3 Remanded from   ○ 4 Reinstated   ○ 5 Transferred from   ○ 6 Multi district   ○ 7 Appeal to
   Proceeding    from State    Appellate Court    or Reopened    another district    Litigation    District Judge
             Court                               (specify)                       from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

16 USC § 1540(g)(1) Endangered Species Act citizen suit

**VII. REQUESTED IN**       CHECK IF THIS IS A CLASS       **DEMAND $** [ N/A ]   Check YES only if demanded in complaint
      **COMPLAINT**   ☐   ACTION UNDER F.R.C.P. 23       **JURY DEMAND:**       YES ☐   NO ☒

**VIII. RELATED CASE(S)**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.
      **IF ANY**

DATE   3/12/2008       SIGNATURE OF ATTORNEY OF RECORD   *[signature]*
       13

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

    The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

    I.         COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

    III.       CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

    IV.       CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

    VI.       CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

    VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

    Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.